UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 3:23-cr-00052 |
| | ) | |
| | ) | JUDGE TRAUGER |
| JAMES EDWARD COWAN | ) | |

**SENTENCING MEMORANDUM ON BEHALF OF THE UNITED STATES**

COMES NOW the United States of America, by and through the undersigned Assistant United States Attorney, Robert E. McGuire, and submits this sentencing memorandum in this matter on behalf of the United States.

The Defendant, James Edward Cowan, was implicated in the murder of an innocent young woman when he was driving right next to her as his passenger, Devaunte Hill, fired multiple shots into her car, killing her. While the Defendant was found not guilty of the murder of Ms. Kaufman he is no innocent. Far from alerting authorities of what he had witnessed Mr. Hill do, the Defendant took affirmative steps to destroy evidence and flee from authorities. Far from showing shock and horror for Mr. Hill's actions in murdering Ms. Kaufman, the Defendant partied with him just a few days later in a Crip-themed celebration, where drugs and firearms were party favors. The Defendant has shown us who he is: a callous gang member who has no regard for the life of the innocent. Respectfully, this Court has an obligation to protect the community from the Defendant for as long as possible. To that end, the United States recommend a total effective sentence of 131 months in the Bureau of Prison.

**APPLICABILITY OF THE SENTENCING FACTORS IN 18 U.S.C. § 3553(a)**

While a sentencing court must start any sentencing procedure with a calculation of the applicable Guideline range, the court must then consider the argument of the parties and factors

set forth in 18 U.S.C. § 3553(a). *See Peugh v. United States*, 569 U.S. 530, 133 S.Ct. 2072, 186 L.Ed.2d 84 (2013). The factors that the Court is to consider are outlined below with a brief discussion of their applicability or inapplicability following that follows:

> I. **"the nature and circumstances of the offense and the history and characteristics of the defendant"**

The road to the Defendant's shameful conduct during and after the murder of Caitlin Kaufman baegan well before December 3, 2020, when Devaunte Hill fired the shots that murdered her and the Defendant drove him away afterwards. The Defendant is now almost thirty-two years old and was born and raised in Nashville. (PSR, ¶ 57-59.) He described his childhood to the Pre-sentence Report writer as having his basic needs met and devoid of abuse. (PSR, ¶ 59.) The Defendant described the neighborhood he grew up in as "rough" and claims to have seen and experienced some level of violence. *Id*. However, he reported no history of mental or emotional problems and the Pre-sentence Report writer found no information to suggest otherwise. (PSR, ¶ 63.)

The Defendant attended high school through the 11th grade but did not earn his high school diploma. (PSR, ¶ 71.) He earned his GED in September 2014 at the age of twenty-two. The Defendant reported two stretches of gainful employment: the first was for a year when he was fifteen when he worked in a Kroger grocery store, the second was for a year in 2016-2017 when he was a laborer for a lawn care company. It is a decidedly sparse employment history for a man in his early thirties. The PSR is devoid of any notation of any special skills the Defendant has or any job training he received despite several stints in correctional facilities. The Defendant's work history from 2017 to 2020 is totally void because he had no lawful employment during those years but, the evidence in this case would suggest, that his real vocation was selling drugs. The PSR

2

notes that the Defendant has used a variety of drugs as an adult (PSR, ¶ 65) but any attempts he has previously made to conquer any addition issues appear to be uneven and half-hearted. For example, the Defendant apparently completed an inpatient treatment program at Buffalo Valley in 2020[1] (PSR, ¶ 67) but not only reported his use of multiple drugs into 2021 (PSR, ¶ 65) he has pleaded guilty to possessing narcotics with the intent to distribute them in the days leading up to his arrest in January 2021. What is clear is that the Defendant had a previous opportunity to attend and complete a treatment program, as well as be in a recovery community (PSR, ¶ 68) but he was not able to maintain a commitment to sobriety.

The Defendant's violent behavior was first recorded at the age of seventeen when he, along with three other males, brandished firearms, and robbed a store. (PSR, ¶ 41.) He was originally charged with two counts of Aggravated Robbery and was transferred to Davidson County Criminal Court stand trial as an adult. He made bond but, while on bond for violent offenses, he continued to engage in criminal behavior regarding firearms. Just about a year after committing an armed robbery (and while still on bond for it) the Defendant was arrested as the passenger in a vehicle that was stopped by law enforcement. (PSR, ¶ 42.) In the car were three, loaded firearms. *Id*. A bag of marijuana was on the Defendant when he was arrested. *Id.*

In June 2011, the Defendant pled guilty to the lesser offense of Robbery (PSR, ¶ 41) and to misdemeanor drug and firearms charges (PSR, ¶ 42.) He was placed on a total of six years of probation. (PSR, ¶ 41.) Not even sixty days later the Defendant was arrested again while in possession of marijuana and a set of digital scales. (PSR, ¶ 43.) His previous probationary sentences were violated, and he served a couple of months in a local jail before being placed back

---

[1] The Defendant reported completing the treatment program in 2020 and the PSR cites records of treatment completion in 2018. It is unclear of these were two separate treatment stints or if the Defendant was simply mistaken about when had completed his treatment course at Buffalo Valley.

3

on probation (with a concurrent probation term on his newest arrest). He was released on November 7th before being arrested barely six weeks later in Wilson County where he gave the name "James Lillard" (apparently and conveniently using his father's last name while hoping to avoid a probation violation based on a new arrest) when the police encountered him. (PSR, ¶ 44.)

Three more probation violations followed and stemmed from the Defendant's failures pass drug screens, verify employment, and generally live up to his obligation while on an alternative sentence. (PSR, ¶ 41.) He did several periods of "shock incarceration" during this period of time – his longest stint was for 90 days – before his probation sentence was revoked in March 2014 and he remained in custody through the end of the year before finishing his sentence on his original robbery conviction. *Id*. Just over eighteen months later, the Defendant was arrested again with another illegally possessed firearm (his third such arrest in less than five years). (PSR, ¶ 45.) In the fall of 2016, the Defendant was given a significant break by the local prosecutor's office when his felon in possession of a firearm case was reduced to a misdemeanor, and he was placed on probation for it. *Id*. He was convicted of two other misdemeanors and was sentenced to a total of almost three years of probation in November 2016.

The Defendant committed his *fourth* firearms offense a little over two months after being placed on three years of state probation. (PSR, ¶ 46.) He had a loaded Ruger 9mm handgun with an extended magazine along with some oxycodone pills when police encountered him; Davidson County court records show that the gun had been previously reported stolen. Court records show that, again, the Defendant used the name "James Lillard" when encountering the police while on probation. Nevertheless, he was convicted of possessing this weapon. (PSR, ¶ 46.) But, despite the Defendant having three prior arrests for unlawful firearms possession, and despite already being on misdemeanor probation for unlawful firearm possession (which, itself, was a lesser charge) the

4

Defendant, for reasons passing understanding, was allowed to plead to a misdemeanor firearm charge *again* with that probation just stacked on top of the three other misdemeanor probations he was already on (and had already violated). (PSR, ¶ 46.)

The Defendant's first set of probationary sentences – from 2016 – was finally revoked some eight months after he was arrested on his probation violation and his sentences were placed into effect. (PSR, ¶ 45.) However, in February 2018 the Defendant was re-instated to probation and ordered to attend the Davidson County Recovery Court program. The Recovery Court program's goals are to "improve the life of the offender" and provides "many services needed for positive reintegration into the community".[2] The program provides significant support for the individuals in it with the stated goal of having the participants "reenter their community in recovery and independent of legal involvement and substance abuse disorder." The program is supervised by a longtime General Sessions Judge who openly and candidly discusses his own past struggles with substance abuse with participants and attempts to direct valuable resources to program participants. Without question, addiction can be a terrible illness and recovery is rarely an unbroken line of successes; anyone who has dealt with addiction personally or experienced it with family members can attest to that. And yet, personal responsibility of the individual in addiction is, at some level, necessary for recovery along with the support and assistance of others. Amid all of the support and potential assistance of the Davidson County Recovery Court, the Defendant violated the conditions of the program three separate times. *Id*.

On one occasion in May of 2019, the Defendant – who had an outstanding warrant for one of those probation violations – fled from officers and barricaded himself in his residence for half an hour before ultimately surrendering. (PSR, ¶ 47.) Nevertheless, his probation was simply

---

[2] https://gscourt.nashville.gov/departments-services/recovery-court/ last accessed September 12, 2024.

restarted ten days later. (PSR, ¶ 46.) The Defendant was on this probation when he and Devaunte Hill made their fateful drive down I-440 at the same time Caitlyn Kaufman had the fatal misfortune to encounter them and draw their attention.

On December 3, 2020, the Defendant was driving a Cadillac, a rental car that was not only rented in someone else's name but under suspicious circumstances. (Doc. No. 22, PageID #: 108-111.) The address given for the renter – who appeared to be a fake identity named Travis Sewell – was a vacant lot in Long Beach, California. *Id.* The car had originally been rented in Florida as a one-day rental and was well overdue by early December 2020. Unquestionably, Devaunte Hill was the passenger in this suspicious rental car that the Defendant was driving when some incident caused Hill to fire multiple shots into Caitlyn Kaufman's vehicle. As the Court knows, Hill was convicted of Second Degree Murder, the Defendant his co-defendant, was acquitted. As Sergeant Dickerson testified before this Court, the fact that Hill took the stand in his own defense and attempted to exonerate the Defendant played an outsized role in that result. To be clear, the Government is not asking this Court to punish the Defendant for a murder that he was acquitted of. However, the Defendant's actions during and after the murder are profoundly relevant considerations for this Court as it relates to the need to: "promote respect for the law…afford adequate deterrence to criminal conduct…to protect the public from further crimes of the defendant." 18 U.S.C § 3553(a). This Court needs to understand who the Defendant is to assess his respect for the law (or lack thereof), whether he is amenable to correction, and to what extent the public needs to be further protected from the defendant.

One can imagine the shock and horror of seeing a friend pull out a gun and fire shots into the vehicle of a random stranger. For most of us, such an event would prompt us to pull over to the side of the road and flee that friend. Even if we were understandably frightened by the friends'

behavior in the moment, we would look for the earliest opportunity to get the friend out of our car and ourselves to safety; it would be unimaginable to most of us to continue to associate with someone who had just committed wanton violence against a stranger. The Defendant, however, took a different approach:



(Doc. No. 47, Exhibit 1.) The Defendant's Cheshire cat grin is disturbing. In one hand is a bag of weed. In his other, is a gun. Right behind him, flashing some money, is Devaunte Hill his friend who had just murdered an innocent young woman in front of him. Make no mistake, both the Defendant and Devaunte Hill knew that that woman Hill had had shot at was dead when this picture was taken on the night of December 5-6, 2020. (Doc. No. 22, Page ID #: 105.) Her murder, which had occurred approximately 48 hours earlier, had made news all over Nashville. It would have been impossible for him not to know. As Ms. Kaufman's family was in the early stages of unimaginable grief, the Defendant was partying it up with her murder. And a gun.

The Pre-sentence Report states that the Defendant has no gang affiliation. This photograph – from the same party – begs to differ:

7



8

For his twenty-eighth birthday celebration, the Defendant chose to blow out the candles of a Crip cake in his honor, with the gang's colors of blue and yellow prominently featured. As he blew out the candles, one wonders if he paused to consider that Caitlyn Kaufman – a woman he had watched his friend murder in front of him – would not have a twenty-eighth birthday. She died at twenty-six about forty-eight hours earlier. The United States would submit that he made no such pause. Indeed, the Defendant did not appear troubled in the slightest by the murder that he had witnessed his friend commit. As the Metro Nashville Police Department worked tirelessly to gather answers about who was behind Ms. Kaufman's murder and why, the Defendant – a man with all of those answers – did absolutely nothing. He made no anonymous call to MNPD's Crime Stoppers, to identify Hill. He asked no friend and confident to do it for him. He didn't even separate himself from Hill much less try to limit any of Hill's immediate access to a firearm (like the one that the Defendant carried in the photo with Hill and the one displayed in front of his birthday cake like a maleficent party decoration). However, as we shall see, it wasn't just passivity that marked the conduct of the Defendant in the aftermath of Ms. Kaufman's murder.

On December 12, 2021, Devaunte Hill was arrested for the murder of Caitlyn Kaufman. Shortly thereafter, the car that the Defendant had been driving in with Hill during the murder was set on fire. (Doc. No. 22, PageID #: 113.) Clearly, Hill could not have set the car on fire since he was in custody. Who, then, would be similarly motivated to burn potential evidence of participation in a murder? Realistically, only the Defendant. This Court can use common sense to infer that the Defendant, upon learning that Hill had been arrested, set the vehicle used in the murder on fire. This Court can use common sense to infer that the Defendant took that action to destroy potential evidence against him. This window into the Defendant's character is extremely relevant at sentencing: the Defendant did the exact opposite of take accountability for his actions

9

in the death of Ms. Kaufman. If, as the Defendant claims, he was merely an innocent bystander to the murder of Ms. Kaufman, then his action in setting the car on fire are profoundly inconsistent with that position. The Defendant had no plans to go to the police and describe what he had seen. That much was established by his attempts to hide from police with the assistance of his girlfriend. (*Id* at PageID #: 114-115.) Had the Defendant not been arrested by MNPD, he would have fled the jurisdiction in hopes of never facing accountability for his part in the murder of Ms. Kaufman. Again, this goes to the Defendant's character. These actions show the Court who he truly is and therefore, how the Court must approach sentencing him under the §3553(a) factors. Finally as to this point, it was not enough that the Defendant destroyed evidence and attempted to flee the jurisdiction; he also re-armed himself. This is the *fifth* time the Defendant has been convicted for an illegal firearms offense. Even while on the run from a homicide charge, to say nothing of the *multiple* probation terms for illegal firearms possession he was *already* on, the Defendant had no compunction about arming himself again. This too, tells us a great deal about who the Defendant is and the danger he poses to the community.

In sum, the Defendant's "characteristics" are that he is violent, he is a gang member, he had no conscience as it related to the murder of an innocent woman, he has little hesitation to destroy evidence that may hold him accountable for wrong doing, he openly defied the law related to unlawfully possessing firearms, and he has worked two legitimate jobs (for less than 24 months) in almost fourteen years of being an adult. Respectfully, even the argument that the Defendant's brain was underdeveloped holds little purchase – even with his prior drug use – because the Defendant was twenty-nine years old when he committed these federal offenses. His brain was developed enough to make the choices he did. His background of growing up in a public housing project is no different from thousands of Nashvillians who do *not* get convicted five times for

10

firearms possession, who do *not* join a criminal street gang, who do *not* have a violent criminal record, and who work every day at regular jobs to take care of themselves, their families, and their communities. Respectfully, the Court would be hard pressed to find legitimate mitigation outside of the hearing-specific, conjured mitigation offered by skilled defense attorneys primarily interested in acquiring and presenting such circumstances. The Defendant has shown us who he us. The public respectfully requests that this Court believe him and sentence him accordingly.

##### II. Considerations regarding the sentence imposed:

Section Two of 18 U.S.C. § 3553(a) deals with the requirements of any sentence to be imposed and, in turn, lists a variety of sub-factors for a court to consider in fashioning a sentence. Those include the following:

> "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;"

18 U.S.C. § 3553(a)(2)

As noted above, the United States submits that this is the Defendant's *fifth* conviction for illegal weapons possession. He has not gotten the message. Other, shorter, terms of incarceration have not made a difference in his behavior. His disrespect for court orders is flagrant, how else to explain a man on *multiple* probation terms for illegal weapons possession who arms himself again? To promote respect for the law, a significant sentence is called for. A significant variance would depreciate the seriousness of this offense for this Defendant under these specific circumstances.

These circumstances are not run of the mill. It is not every day that this Court is faced with a Defendant who was fully implicated in the murder of an innocent person, destroyed evidence of that murder, attempted to run from it, and was armed and selling drugs while doing so.

Deterrence is also required and only a significant federal sentence can do it. Clearly, shorter incarceration terms have not impacted the Defendant's criminal behaviors or his criminal thinking. The Defendant must be specifically deterred from committing crimes. There is value in public deterrence as it relates to illegal firearms possession. The Defendant has been afforded multiple chances to avoid criminal activity without lengthy jail sentences; to be fooled again into thinking that *another* break (such as a significant variance) will somehow be the break that triggers a change in the Defendant is, respectfully, folly that the public can't afford.

The public needs to be protected from the Defendant. Nothing in his history can give this Court any confidence that he will be successful on release such that a shorter sentence is advisable. Perhaps he will be successful on release. However, to grant the Defendant a significant variance based on hope alone is an insufficient ground. The Defendant's anti-social behavior is well documented, it requires a significant sentence to keep others safe from such behavior and attitudes.

### III. Issues with the Sentence; Policy Considerations; Restitution

The remainder of the factors described in 18 U.S.C. § 3553(a) are concerned with the kinds of sentences available to the court, the category of offense, any amendments to the guidelines, any pertinent policy statements by the U.S.S.G., a need for unwanted sentencing disparity and restitution.

The United States Sentencing Commission maintains, for the use of courts and practitioners, a database regarding the lengths of various federal sentences ordered across the

United States. That database, called the Judiciary Sentencing Information (JSIN)[3] database allows users to select a Guideline Range as well as case-specific factors to search for appropriate data on other similarly situated defendants who have been sentenced nationwide. According to the most recent JSIN data, during the last five years, a defendant in this Defendant's situation – with his same charges and Guideline Range – received an average sentence of 122 months' imprisonment. The United States would respectfully submit that if the Court ordered a significant variance off of this sentence there would be a danger of unfair sentencing disparities that the Court must attempt to avoid in crafting an appropriate sentence.

## CONCLUSION

This Court knows that undersigned counsel is not a "one-size-fits all" prosecutor when it comes to making sentencing recommendations. This Court knows that, where appropriate and adequately supported by the facts, undersigned counsel has no hesitation in recommending a downward variance or arguing that a particular Guideline application should not apply to the benefit of a defendant. Undersigned counsel does not simply recommend a Guideline sentence without deliberation or as a matter of course; sentencing recommendations from the United States mean something and they should be well-considered. Routinely, that may mean an acknowledgement of significant mitigation in a defendant's background or a recognition that a given Guideline provision or sentencing range is overly harsh. Undersigned counsel has no compunction about such acknowledgements and recognitions. Respectfully, this is not one of those cases. Rather, in cases where the danger to the public is palpable, where there is evidence of significant violence in a defendant's past or the great potential for it in the future, it is incumbent on actors within our judicial system to protect the safety of the community. In this case, the

---

[3] https://jsin.ussc.gov/analytics/saw.dll?Dashboard last accessed September 12, 2024.

Defendant is a violent and dangerous man as evidenced not just by his conduct during and after the murder of Ms. Kaufman but by his prior criminal history and his conduct in the federal case. The United States respectfully submits that a sentence of 131 months, while still a Guideline sentence, is sufficient and not greater then necessary to protect the public from future conduct by the Defendant and to serve the ends of justice.

Respectfully submitted,

HENRY C. LEVENTIS
United States Attorney

By:   */s/ Robert E. McGuire*
     ROBERT E. MCGUIRE
     Assistant U.S. Attorney
     719 Church Street, Suite 3300
     Nashville, Tennessee 37203
     Phone: (615) 401-6610
     robert.mcguire@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing will be served electronically to counsel for defendant via CM/ECF on the 16th of September, 2024.

*/s/ Robert E. McGuire*
ROBERT E. MCGUIRE